IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

CIVIL CASE NO. 3:07cv176

MARK JAMES TINGLEY and )
LEA MICHELLE TINGLEY[1], on )
behalf of themselves and )
others similarly situated, )
)
Plaintiffs, )
) **MEMORANDUM OF**
vs. ) **DECISION AND ORDER**
)
BEAZER HOMES CORP. and )
BEAZER MORTGAGE )
CORPORATION, )
)
Defendants. )
)

**THIS MATTER** is before the Court on the Motion to Dismiss [Doc. 9] filed by the Defendants Beazer Homes Corp. ("Beazer Homes") and Beazer Mortgage Corporation ("Beazer Mortgage").

## I.  Factual Background and Procedural History

The Plaintiffs Mark James Tingley and Lea Michelle Tingley originally

---

[1]The style of the Complaint [Doc. 1-2] identifies the Plaintiffs as "Mark James Tingly [sic]" and "Lea Michelle Tingly [sic]."  All of the subsequent pleadings in this matter (including all subsequent filings by the Plaintiffs), however, list the individual Plaintiffs as "Mark James Tingley" and "Lea Michelle Tingley."  The Court will adopt the spelling of the Plaintiffs' names as used in these latter pleadings.

filed their Complaint in the Mecklenburg County General Court of Justice, Superior Court Division, on March 23, 2007. [Complaint, Doc. 1-2]. The Defendants were served with the Complaint on March 26, 2007, and they removed the matter to this Court on April 20, 2007. [Notice of Removal, Doc. 1].

The Plaintiffs seek damages from the Defendants for unfair and deceptive trade practices pursuant to North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1, *et seq*. ("UDTPA"). [Complaint, Doc. 1-2 at ¶¶34-37]. The Plaintiffs seek to bring this action on behalf of themselves and "[a]ll North Carolina residents who purchased homes in subdivisions in North Carolina containing homes constructed by [the Defendants] where the foreclosure rate for the subdivision is significantly higher than the statewide average." [Id. at ¶15].

Taking all of the factual allegations in the Plaintiffs' Complaint as true, the following are the relevant facts. In 2001, the Plaintiffs purchased a newly constructed home in the Southern Chase subdivision from Beazer Homes. [Id. at ¶4]. Beazer Homes is in the business of constructing and selling newly constructed homes in North Carolina and throughout the United States, and it primarily builds homes in subdivisions where it is

either the only builder or one of a few builders. [Id. at ¶22]. Beazer Mortgage arranges financing loans for prospective purchasers to buy homes constructed by Beazer Homes in North Carolina and throughout the United States. [Id. at 23].[2]

The Complaint alleges that the Defendants sought out renters from neighboring apartment complexes and other prospective purchasers whom Defendants considered to be "low income." [Id. at 25]. The Plaintiffs claim that through a "complex conspiracy and scheme," the Defendants helped these purchasers qualify for loans to purchase homes. [Id. at 26]. Specifically, the Plaintiffs charge that Beazer Mortgage advised or encouraged prospective buyers to falsify information on their loan applications or changed the information on those applications to enable the buyers to qualify for loans. [Id. at ¶27]. The Plaintiffs allege that Beazer Mortgage "violated numerous Federal and North Carolina lending laws" and was "part and parcel of the conspiracy and scheme." [Id. at ¶28]. The Plaintiffs allege that the Defendants' conduct resulted in "numerous home purchasers becoming obligated for mortgage payments on loans for which

---

[2]Paragraphs 23 and 24 of the Complaint allege certain conduct by an entity named "Squires," which is a not a named party in this action. Given the context of the Plaintiffs' allegations, the Court presumes that the Plaintiffs intended to refer to the conduct of Beazer Homes in these paragraphs.

3

they would not have qualified for [sic] but for Defendants' illegal acts." [Id. at ¶30].

The Plaintiffs allege that the Defendants' conduct resulted in widespread foreclosures in numerous subdivisions throughout North Carolina, including Southern Chase, resulting in a foreclosure rate "which substantially exceed[s] the statewide average." [Id. at ¶31]. The Plaintiffs allege that these widespread foreclosures have "devalued the homes in the subdivisions," [id. at ¶ 32], and specifically that "the high rate of foreclosure caused Plaintiffs' home to abnormally depreciate," [id. at ¶7].

The Defendants move to dismiss the Plaintiffs' Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For grounds, the Defendants argue that the Plaintiffs lack standing to bring this action, and therefore, there is not a case or controversy over which this Court may exercise jurisdiction. The Defendants further argue that because the Plaintiffs have failed to state an actual injury that was proximately caused by the Defendants, the Plaintiffs have failed to state a claim upon which relief can be granted. [Defendants' Motion to Dismiss, Doc. 9].

## II. Standard of Review

### A. Rule 12(b)(1) Motion to Dismiss

As standing "is a fundamental component of a court's subject-matter jurisdiction," a defendant may properly challenge a plaintiff's standing by way of a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Dash v. FirstPlus Home Loan Trust 1996-2, 248 F.Supp.2d 489, 501 (M.D.N.C. 2003); see also Miller v. Augusta Mut. Ins. Co., 157 Fed. Appx. 632, 635 (4th Cir. 2005) ("The concept of standing -- which requires that the plaintiff have a sufficiently personal stake in the outcome of the litigation -- forms an indispensable part of the Article III case-or-controversy requirement.").

The burden is on the Plaintiffs to demonstrate that subject matter jurisdiction exists. See Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). The Court should grant a Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991), cert. denied, 503 U.S. 984, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992).

There are two different ways that a defendant may present a motion to dismiss for lack of subject matter jurisdiction.  First, the defendant may contend that the "complaint simply fails to allege facts upon which subject matter jurisdiction can be based."  Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).  In that case, the Court must apply a standard similar to that applied in reviewing a Rule 12(b)(6) motion.  Id.  Alternatively, the defendant may assert that the jurisdictional allegations in the complaint are not true, in which case the Court may hold an evidentiary hearing to determine whether there are sufficient facts to support the plaintiff's jurisdictional allegations.  Id.  In the present case, the Defendants argue that the factual allegations in the Plaintiffs' Complaint fail to establish the Plaintiffs' standing, [Defendants' Motion to Dismiss, Doc. 9]; therefore, an evidentiary hearing on the issue of standing is not necessary. Consequently, the standard of review applicable to Rule 12(b)(6) motions will be applied to Defendants' motions pursuant to Rule 12(b)(1), as well as their motions pursuant to Rule 12(b)(6).

**B.    Rule 12(b)(6) Motion to Dismiss**

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests

surrounding the facts, the merits of a claim, or the applicability of defenses." Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks and alterations omitted).  In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993), cert. denied, 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). While the Court must accept the plaintiff's factual allegations as true, the Court "need not accept the legal conclusions drawn from the facts." Eastern Shore Markets, Inc. v. J.D. Associates Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000).  "Similarly, [the Court] need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Id.

As the Supreme Court recently explained:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do ....  Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atlantic Corp. v. Twombly, __ U.S. ___, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).  A complaint will survive a Rule 12(b)(6) motion to

7

dismiss if it sets forth "enough facts to state a claim to relief that is plausible on its face." Id. at 1974.

## III.  Analysis

The "irreducible constitutional minimum of standing" contains the following elements:

> First, the plaintiff must have suffered an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not ... the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal citations and quotation marks omitted).

Attention is first focused on the second of these elements. The injury the Plaintiffs claim must be "fairly traceable" to the alleged wrongful acts of the Defendants rather than the acts of others who are not before the Court. Id.; Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450, 462 (1976).

On this element, the Simon case is instructive. In that case, several indigent persons and organizations advocating on their behalf brought suit against the Internal Revenue Service (IRS), alleging that by extending certain favorable tax treatment to nonprofit hospitals, the IRS was encouraging these hospitals to deny services to financially disadvantaged individuals such as the plaintiffs. Id. at 28, 96 S.Ct. at 1919-20. The Supreme Court concluded that it was "purely speculative whether the denials of service specified in the complaint fairly can be traced to [the IRS's] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." Id. at 42-43, 96 S.Ct. at 1926. The Court further noted that it was "just as plausible that the hospitals to which [plaintiffs] may apply for service would elect to forego favorable tax treatment to avoid the undetermined financial drain of an increase in the uncompensated services." Id. Concluding that "[s]peculative inferences are necessary to connect their injury to the challenged actions" of the IRS, the Court found that the plaintiffs lacked standing to assert their claim. Id. at 45, 96 S.Ct. at 1927.

Similarly, in the present case, the Plaintiffs' allegations require a series of speculative inferences to be drawn in order to connect their

claimed injury to the alleged conduct of the Defendants.   Plaintiffs allege that Defendants conspired to qualify "low income" persons for home loans by deceptively changing and falsifying information on loan applications, which loans "in many instances, they could not afford and otherwise would not have qualified for."  [Complaint, Doc.1-2 at ¶29].  Plaintiffs allege that this resulted in foreclosures "exceeding the statewide average" [Id. at ¶31] in subdivisions where the Plaintiffs and proposed class members own homes, and that these foreclosures diminished the value of the Plaintiffs' and class members' homes. [Id. at ¶32].

      Taking the allegations in the light most favorable to the Plaintiffs and giving the Plaintiffs the benefit of all reasonable inferences, the persons who were deceived by the wrongful acts of the Defendants were not the Plaintiffs or proposed class members, but rather the purchasers whose loan applications were falsified, as well as those prospective assignees of the mortgage notes themselves. Conspicuously absent from the Plaintiffs' allegations is any assertion that the Defendants practiced such deception with regard to the loans of the Plaintiffs or any class members.  In fact, Plaintiffs do not allege that they or any class member had any contract or dealings of any kind with either Defendant, except that Plaintiffs allege that

they purchased their home directly from Defendant Beazer Homes Corp. in 2001. [Id. at ¶4].

To make the necessary connection between the alleged actions of the Defendants and the claimed depreciation of the Plaintiffs' homes, a series of speculative inferences must be drawn. Although the Plaintiffs allege that the Defendants defrauded third party home buyers and mortgage assignees, it does not necessarily follow from this allegation that these third party home buyers subsequently defaulted on their mortgages due to the Defendants' conduct rather than those buyers having failed to make their mortgage payments as a result of other factors, such as unemployment, health problems, a general weakening in the economy, or other financial conditions. In addition to the failure of these mortgagors to make their payments, there is the issue of the intervening decisions by the mortgage assignees to foreclose the defaulted mortgages rather than to restructure the loans, which may have been done for reasons totally apart from the alleged fraud. Further, it is quite speculative that the depreciation in value of the Plaintiffs' property was caused by the foreclosures of these third party properties rather than as a result of a myriad of other factors, such as rising unemployment in the region, changes in the housing market,

or other economic conditions. It is just as plausible that any one of these other factors caused any reduction in the Plaintiffs' property value. To the extent that any diminished values resulted from the foreclosures, however, the connection remains too tenuous to provide standing. Foreclosures can adversely impact property values by increasing available supply, but it is a basic principle of the law of supply and demand that they may be simultaneously affected by any number of market factors. If those market factors were different, the impact upon Plaintiffs' property value would be different. The tenuousness of the connection between the Defendants' alleged actions and the alleged diminished value in Plaintiffs' property becomes greater with each additional link in the chain where the choices of others have an impact and make other scenarios at least as plausible as the one advanced by the Plaintiffs. Likewise, it is just as plausible that a positive change in the unemployment rate, the housing market, mortgage interest rates or other economic factors could cause an increase in the Plaintiffs' property value.³ See Green v. Beazer Homes Corp., C/A No.

---

³ This also implicates the question of whether Plaintiffs have suffered a "concrete and particularized, and actual or imminent" injury, Lujan, 504 U.S. at 560-61, 112 S.Ct. at 2136, necessary to meet the first element of Article III standing. Since the reduced value about which Plaintiffs complain would have resulted from an economic glut of supply, then such harm is only realized if Plaintiffs sell their home during such glut. If Plaintiffs chose to remain in their home until more favorable economic conditions arrive,

12

3:07-1098-CMC, 2007 WL 2688612, at *3 (D.S.C. Sep. 10, 2007) (finding the effect of "widespread foreclosures" in surrounding neighborhoods had, at most, a short term impact on the value of the plaintiff's home and therefore, claim for depreciation of home was "conjectural and speculative"). The connection between the alleged actions and alleged harm presented by the Plaintiffs herein is actually much more tenuous than that found wanting in Simon.

    As recited above, in determining whether the Plaintiffs have Article III standing the Court must apply the same standard as it would in deciding a motion under rule 12(b)(6). By that standard the Plaintiffs must allege sufficient facts "to raise a right to relief above the speculative level," Twombly, 127 S.Ct. at 1965. This the Plaintiffs have failed to do. Taking their allegations as true, it is too speculative as to whether the harm Plaintiffs allege is "fairly traceable" to the alleged wrongs of the Defendants. Hence, the Plaintiffs have no standing to complain of the

---

then they will have realized no loss at all. See generally, Coker v. DaimlerChrysler Corp., 172 N.C. App. 386, 617 S.E.2d 306 (2005). Since the Court holds that the Plaintiffs have no standing based on the failure of their allegations to fulfill the "fairly traceable" element of Article III standing, the Court will not further address the injury element.

Defendants' alleged attempts to defraud third parties, and this Court has no subject matter jurisdiction to entertain this case.

## V. Conclusion

For the foregoing reasons, **IT IS, THEREFORE, ORDERED** that the Defendant's Motion to Dismiss [Doc. 9] is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**, and judgment shall issue simultaneously herewith.

**IT IS SO ORDERED.**

Signed: April 25, 2008

Martin Reidinger
United States District Judge